UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DANIEL DELACRUZ,

    Plaintiff,

v.

TANIMURA & ANTLE, INC., et al.,

    Defendants.

Case No. 23-cv-03034-VKD

**ORDER GRANTING DEFENDANT QUIRARTE'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. No. 56

Plaintiff Daniel Delacruz, who is representing himself, filed this action against defendants Tanimura & Antle, Inc. ("TAI"), Mike Antle, and Carmen Ponce (collectively, "TAI defendants") and Claudia Quirarte, asserting, among other things, unlawful disability discrimination under the Americans with Disabilities Act ("ADA"). Dkt. No. 1. Since the filing of this lawsuit, the Court has granted defendants' respective motions to dismiss Mr. Delacruz's claims (Dkt. Nos. 28, 29, 52, 53), and Mr. Delacruz has amended his complaint twice, asserting federal claims only against Ms. Quirarte (Dkt. Nos. 34, 55). In its most recent order, the Court dismissed the federal claims asserted against Ms. Quirarte, with leave to amend only as to Mr. Delacruz's claim under the Rehabilitation Act. Dkt. No. 52. The Court declined to exercise supplemental jurisdiction over any of Mr. Delacruz's state law claims, unless and until he pleads a viable federal claim for relief. *Id.*

Ms. Quirarte now moves pursuant to Rule 12(b)(6) to dismiss Mr. Delacruz's second amended complaint ("SAC").[1] Dkt. Nos. 56, 61. Mr. Delacruz opposes the motion. Dkt. No. 59.

---

[1] The Court will issue a separate order addressing the TAI defendants' motion to dismiss the SAC.

The Court deemed the motion suitable for determination without oral argument. *See* Civil L.R. 7-1(b); Dkt. No. 63. Upon consideration of the moving and responding papers, the Court grants Ms. Quirarte's motion to dismiss the Rehabilitation Act claim without leave to amend.[2]

**I.    BACKGROUND**

According to the SAC, Mr. Delacruz was diagnosed in 1992 with Fabry Disease, a rare hereditary enzyme deficiency disorder, for which he receives enzyme replacement therapy ("ERT") "on a regular basis to prevent chronic organ failure and death." Dkt. No. 55 ¶¶ 13, 15. Ms. Quirarte is identified as a registered nurse employed by Central Coast Nephrology, the medical facility where Mr. Delacruz received ERT. *Id*. ¶¶ 6, 23, 37. Defendant TAI is a produce company that employed Mr. Delacruz from about April 1988 to July 1996. *See* Dkt. No. 55 ¶¶ 7, 13 & Ex. 1 at ECF 2. Defendant Mike Antle is identified as an "owner, employee, and a Vice President" of TAI. Dkt. No. 55 ¶ 8. Defendant Carmen Ponce is identified as TAI's "Vice President of Human Resources and Assistant General Counsel[.]" *Id*. ¶ 9.

In 1998, Mr. Delacruz sued TAI and Mr. Antle in state court for race discrimination. *Id*. ¶ 14. The parties resolved the matter and entered into a settlement agreement. *Id*. & Ex. 1. According to Mr. Delacruz, as part of that settlement, the TAI defendants agreed not to harass him. *Id*. Mr. Delacruz claims that the TAI defendants have breached that agreement by, among other things, "disseminat[ing] to various people, including Claudia Quirarte, falsehoods including that [he] 'filed a lot of complaints that went nowhere' and that [he] is 'not disabled.'" Dkt. No. 55 ¶ 29.

Mr. Delacruz alleges that his "hereditary disorder was well known to [Mr.] Antle and [Ms.] Ponce." *Id*. ¶ 19. For example, he says that on one occasion during his employment with TAI, Rick Antle (identified as TAI's president, now deceased) was in a break room eating one of TAI's salad products with heavy dressing. *See id*. ¶ 21. When Mr. Delacruz commented, "[B]e careful, that stuff can give you a heart attack," Rick Antle reportedly replied, "[Y]ou're the one that needs to worry about that stuff!" Dkt. No. 34 ¶¶ 21, 22. According to Mr. Delacruz, Rick Antle's

---

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 6, 9, 14.

response was a gloating reference to his enzyme deficiency disorder and an indication that Rick Antle believed that he would outlive Mr. Delacruz.  *Id*. ¶ 22.

The SAC further alleges that years later, in 2018, Rick Antle passed away.  *Id*. ¶ 22.  In 2019, during one of Mr. Delacruz's ERT procedures, Mr. Delacruz "recited Rick Antle's malevolent gloat made towards [Mr. Delacruz] and the irony of Rick Antle's death[.]"  *Id*. ¶ 23.  Ms. Quirarte allegedly overheard Mr. Delacruz's comment and repeated it to defendants Mike Antle and Ms. Ponce.  *Id*.  Mr. Delacruz alleges that this "further enraged the visceral contempt that [Mr.] Antle and [Ms.] Ponce have towards [him]" and caused them "to interfere with [Mr. Delacruz]'s health services to fulfill the death threats that [he] had been receiving from TAI's employees[.]"  *Id*. ¶ 24.

Mr. Delacruz alleges that, in addition to telling Ms. Quirarte falsehoods about him, Mr. Antle and Ms. Ponce "solicited [Ms.] Quirarte to obtain a sample of [Mr. Delacruz]'s blood for nefarious purposes," e.g., "for analysis to fraudulently dispute [Mr. Delacruz]'s disability of Fabry Disease."  *Id*. ¶ 29.  Mr. Antle and Ms. Ponce allegedly "also solicited [Ms.] Quirarte to interfere with [Mr. Delacruz]'s ERT procedures by deceitfully leaving out the medication from [his] [intravenous] IV bags," "caus[ing] [Mr. Delacruz]'s various organ functions to deteriorate over time including his central nervous system resulting in tremors to his hands and loss of dexterity."  *Id*. ¶ 32.

The SAC alleges "[i]n the alternative," that Mr. Antle's and Ms. Ponce's "reckless dissemination of falsehoods . . . motivated [Ms.] Quirarte to interfere sua sponte with [Mr. Delacruz]'s ERT medication" and "to obtain a sample of [Mr. Delacruz]'s blood and deliver it to [Mr.] Antle and [Ms.] Ponce sua sponte to dispute [Mr. Delacruz]'s disability."  *Id*. ¶ 33.  Mr. Delacruz says that during one of his medical procedures, in which Ms. Quirarte removed an IV needle from his arm, she "deliberately released the pressure from [his] vein over the injection site and maneuvered the needle out in an exaggerated arching path causing the needle to drip a stream of blood onto the medical pillow" that was supporting his arm.  *Id*. ¶ 39.  Ms. Quirarte reportedly never did this before.  *Id*. ¶ 40.  Rather than comply with protocols requiring that the pillow promptly be disposed "in the red biohazard receptacle that is located in the patient's treatment area

3

in plain view of [Mr. Delacruz]," Ms. Quirarte reportedly "took the disposable pillow case stained with [Mr. Delacruz]'s blood back to her work area located in a small room about twenty feet opposite to where [Mr. Delacruz] was seated and placed it on a shelf." *Id*. ¶ 41. According to the complaint, Ms. Quirarte previously "never deviated from the proper disposal protocol of used disposable medical pillow cases." *Id*. The SAC further alleges that Ms. Quirarte violated Mr. Delacruz's privacy rights by giving the blood-stained pillowcase "to [Mr.] Antle and [Ms.] Ponce to use for their nefarious purpose of fraudulently disputing [Mr. Delacruz]'s disability." *Id*. ¶ 42.

Additionally, the SAC alleges that "[Ms.] Quirarte would harass [Mr. Delacruz] with contemptuous and snide remarks including '[Y]ou don't look disabled.'" *Id*. ¶ 37. During an April 2021 ERT procedure, Ms. Quirarte reportedly "contemptuously star[ed]" at Mr. Delacruz and "snidely remarked . . . 'Look, he's going to start complaining!'" *Id*. ¶ 38. Mr. Delacruz says that "[w]henever possible, [he] would change his schedule for his ERT procedures so that a different nurse would prepare his medication in an attempt to avoid [Ms.] Quirarte." *Id*. Ms. Quirarte, however, allegedly "would also adjust her work schedule to remain as [Mr. Delacruz]'s nurse." *Id*.

The SAC further alleges that after Mr. Antle and Ms. Ponce "disseminated to [Ms.] Quirarte their fraudulent dispute" regarding his disability, and Ms. Quirarte made a "snide comment to [Mr. Delacruz] that he did not look disabled," Ms. Quirarte "deceitfully left out the ERT medication from [his] IV bags," "caus[ing] [his] various organ functions to deteriorate over time including his central nervous system resulting in tremors to his hands and loss of dexterity." *Id*. ¶ 43. Additionally, Mr. Delacruz alleges that around June 26, 2019, Ms. Quirarte prepared his IV bag "that appeared abnormal and foamy, which had never occurred in over 600 ERT treatments that [he] has received over the past 25 years." *Id*. ¶ 44. But when Mr. Delacruz inquired about it, Ms. Quirarte reportedly "responded with an excuse that 'it just needs to settle.'" *Id*. ¶¶ 44, 45. Suspicious that Ms. Quirarte had "tampered [with] or adulterated his medication," Mr. Delacruz says that he photographed the IV bag and later showed it to a nephrologist at the facility who is familiar with ERT medication, as well as to a representative of the company that developed the ERT medication, both of whom affirmed that the IV bag that was prepared by Ms. Quirarte

appeared abnormal. *Id*. ¶¶ 48-50.  He asserts that "[n]umerous months later, [his] blood labs began to show discrepancies in his organ function levels," which "perplexed" his nephrologist "as to what was causing the downward trend because the ERT had stabilized [his] organ functions for over twenty years." *Id*. ¶ 47.

Mr. Delacruz says that in the meantime, he became more suspicious of Ms. Quirarte and began to seat himself closer to her work area so he could observe her while she prepared his medication. *Id*. ¶ 48.  However, Mr. Delacruz says that his view was partially blocked by Ms. Quirarte's back, and she "took notice of [his] new seating arrangement and would constantly look over her shoulder and use her peripheral vision to see if [he] was observing her prepare [his] ERT medication." *Id*.

Mr. Delacruz says that he told his nephrologist about Ms. Quirarte's "suspicious behavior," "insisted on changing nurses for his ERT medical procedures," and later "changed his medical services provider as an added precaution." *Id*. ¶¶ 51, 52.  However, Ms. Quirarte allegedly accessed Mr. Delacruz's medical file to obtain the name of his new medical services provider and then "telephoned [Mr. Delacruz] to inform him that she was seeking employment with the same medical services provider and wanted to continue as [his] nurse." *Id*. ¶ 53.  Mr. Delacruz says he was "alarmed" and changed his medical services provider yet again "so that [Ms.] Quirarte would not be able to continue as his nurse and to prevent [her] from accessing his medical file from his new medical services provider." *Id*.

In his original complaint, Mr. Delacruz asserted six claims for relief against all defendants, four of which were based on federal law:  disability discrimination and retaliation under the ADA, 42 U.S.C. § 12101, *et seq*. and various implementing regulations (claim 1); civil rights violations, 42 U.S.C. § 1983 (claim 2); breach of contract, 42 U.S.C. § 1981 (claim 3); and request for "Order to Show Cause re Specific Performance and Injunctive Relief," 42 U.S.C. § 1981 (claim 4).  *See* Dkt. No. 1.  The remaining two claims for relief were based on California state law: disability discrimination under the California Unruh Civil Rights Act (Cal. Civ. Code § 51, et seq.) and the Disabled Persons Act (Cal. Govt. Code § 12948) (claim 5); and violation of Article I, § 1 of the California Constitution (claim 6).

5

1  The Court granted Ms. Quirarte's Rule 12(b)(6) motion to dismiss Mr. Delacruz's complaint. All of Mr. Delacruz's federal claims for relief were dismissed, and he was given leave to amend only his ADA claim. *See* Dkt. No. 29. The Court declined to exercise supplemental jurisdiction over Mr. Delacruz's state law claims "unless and until a viable federal ADA claim is adequately pled." *Id*. at 11. Those state law claims were dismissed without prejudice.

Mr. Delacruz filed his first amended complaint, asserting claims against Ms. Quirarte for disability discrimination under ADA Title II (claim 1), disability discrimination under Section 504 of the Rehabilitation Act of 1973 (claim 2), and violation of his privacy rights under Article I, § 1 of the California Constitution (claim 3). The Court granted Ms. Quirarte's Rule 12(b)(6) motion to dismiss the ADA claim without leave to amend. Dkt. No. 52. The Court dismissed Mr. Delacruz's Rehabilitation Act claim with leave to amend. *Id*. The Court declined to exercise supplemental jurisdiction over Mr. Delacruz's state law claim "unless and until a viable federal Rehabilitation Act claim is adequately pled" and dismissed the state law claim without prejudice. *Id*. at 10.

In his SAC, Mr. Delacruz reasserts two claims against Ms. Quirarte: (1) a claim for disability discrimination under the Rehabilitation Act and (2) a state law claim for violation of his constitutional right to privacy. Dkt. No. 55.

Ms. Quirarte moves to dismiss all of Mr. Delacruz's claims, arguing that the SAC fails to state sufficient facts to support any plausible claim for relief.

## II. LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id*. (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id*.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "[f]actual

allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  Moreover, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Prager Univ. v. Google LLC* ("*Prager I*"), No. 17-CV-06064-LHK, 2018 WL 1471939, at *3 (N.D. Cal. Mar. 26, 2018) (quoting *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam)).  Nor does the Court accept allegations that contradict documents attached to the complaint or incorporated by reference, *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014), or that rest on "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  Although pro se pleadings are liberally construed and held to a less stringent standard than those drafted by lawyers, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), a complaint (or portion thereof) should be dismissed for failure to state a claim if it fails to set forth "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570.

Documents appended to or incorporated into the complaint or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion.  *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).  A court may take judicial notice of facts that are "not subject to reasonable dispute" because they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Khoja*, 899 F.3d at 999.  Thus, a court properly may take judicial notice of matters of public record, but cannot take judicial notice of disputed facts contained within such records.  *Khoja*, 899 F.3d at 999 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).

**III.   DISCUSSION**

    **A.   Section 504 of the Rehabilitation Act**

The Rehabilitation Act prohibits discrimination in federally-funded programs and provides, in relevant part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the

7

benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). To state a claim under section 504 of the Rehabilitation Act, a plaintiff must allege facts showing that "(1) he is an 'individual with a disability'; (2) he is 'otherwise qualified' to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (cleaned up).

Ms. Quirarte's motion to dismiss focuses on the third and fourth elements of a Rehabilitation Act claim. She argues that Mr. Delacruz's claim must be dismissed because the SAC fails to state sufficient facts supporting a plausible claim that he experienced discrimination "solely by reason of" his disability. She also argues that Mr. Delacruz's Rehabilitation Act claim fails, in any event, because the Rehabilitation Act applies only to programs and entities and does not apply to individuals. Dkt. No. 56 at 5-6; Dkt. No. 61 at 2-3.

With respect to the third element, Mr. Delacruz responds by pointing to the SAC's allegations regarding Ms. Quirarte's comments about his disability (or lack thereof) and her handling of his ERT medication, suggesting that it may reasonably be inferred that his disability was the sole reason he was deprived of the benefits of receiving health services. Dkt. No. 59 at 3. For purposes of this motion, the Court assumes, without deciding, that the SAC's allegations are sufficient to support an inference that the alleged discrimination was "solely" based on Mr. Delacruz's Fabry Disease. However, his Rehabilitation Act claim fails because the SAC does not allege any facts demonstrating that Ms. Quirarte is a "recipient" of federal financial assistance within the meaning of the Rehabilitation Act. *See* 29 U.S.C. § 794(a).

"Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). "By limiting coverage to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." *Id*. The Rehabilitation Act "covers

8

those who receive the aid, but does not extend as far as those who benefit from it." *Id*. at 607.

The SAC alleges that Central Coast Nephrology received federal financing through various sources—namely, health insurance payments (i.e., Medicare and the Affordable Care Act) and the Paycheck Protection Program. *See* Dkt. No. 55 ¶¶ 68-70. The SAC further alleges that as a nurse working at Central Coast Nephrology, Ms. Quirarte "was financially compensated from the payments received" by Central Coast Nephrology from each of these sources. *See id*. ¶¶ 71-72. Mr. Delacruz argues that these allegations are sufficient to plead the fourth element of a Rehabilitation Act claim regarding receipt of federal financial assistance. *See* Dkt. No. 59 at 8-9. However, Mr. Delacruz has not sued Central Coast Nephrology. The Rehabilitation Act only prohibits discrimination by a "program or activity" receiving "Federal financial assistance." 29 U.S.C. § 794(a). The Rehabilitation Act's definitions of "program or activity" do not include individuals. *See id*. § 794(b). Courts have held that individuals do not receive financial assistance for purposes of the Rehabilitation Act. *See Becker v. Oregon*, 170 F. Supp. 2d 1061, 1067 (D. Or. 2001) ("The overwhelming majority of reported cases addressing this issue, including cases from this district, have held that because individuals do not 'receive financial assistance for purposes of the Rehabilitation Act,' there is no individual liability under the RA.") (citing cases); *see also Doe v. Wirta*, No. 19-cv-00587-JCS, 2019 WL 13472128, at *4 (N.D. Cal. Apr. 10, 2019), *report and recommendation adopted*, 2019 WL 13472129 (N.D. Cal. May 1, 2019) (same).

While the SAC purports to name Ms. Quirarte "in her individual and official capacity" (Dkt. No. 55 ¶ 6), Mr. Delacruz's allegations indicate that he is suing her personally in her capacity as a nurse employed by Central Coast Nephrology. *See* Dkt. No. 55 ¶¶ 23, 37, 71, 72. For purposes of the Rehabilitation Act, "[e]mployees of the recipients of federal financial assistance are not in themselves the recipients of such assistance." *Grzan v. Charter Hosp. of Nw. Indiana*, 104 F.3d 116, 120 (7th Cir. 1997), *abrogated on other grounds as stated in Amundson v. Wisc. Dep't of Health Servs*., 721 F.3d 871, 874 (7th Cir. 2013). Employment by a "program or activity" that is itself "the recipient of federal funds through the Medicaid and Medicare programs . . . . is not enough to implicate [the employee] under section 504" of the Rehabilitation Act. *Id*. at 119; *see also McAuliffe v. U.S. Dep't of Veterans Affairs*, No. C06-07353 WHA, 2007 WL

9

1   2123690, at *2 (N.D. Cal. July 23, 2007) ("Section 504(a) places obligations only on those who

2   actually receive federal funding. Those merely receiving a salary from a federal agency are not

3   included."). Even assuming, without deciding, that the federal Paycheck Protection Program

4   constitutes "Federal financial assistance" within the meaning of the Rehabilitation Act, the

5   purpose of that Program (implemented by the Small Business Administration) was to provide

6   loans to small *businesses*.[3] *See generally Ramey & Schwaller, LLP v. Zions Bancorp. N.A.*, 71

7   F.4th 257, 258 (5th Cir. 2023) (stating that "Congress enacted the Paycheck Protection Program

8   (PPP) to help small businesses keep workers employed during the crisis" by providing loans

9   "made by participating private lenders but guaranteed by the federal government."); *In re Gateway

10  Radiology Consultants, P.A.*, 983 F.3d 1239, 1247 (11th Cir. 2020) (stating that Paycheck

11  Protection Program "is directed at small businesses" and "is designed to give loans to eligible

12  businesses[.]"); *In re Vestavia Hills, Ltd.*, 630 B.R. 816, 839 (S.D. Cal. Apr. 6, 2021) (recognizing

13  "that the broad purpose of the CARES Act and the P[aycheck] P[rotection] P[rogram] was to

14  quickly deliver funds to businesses struggling as a result of the pandemic so that they could

15  continue to operate and pay their employees[.]"). There are no facts alleged indicating that Ms.

16  Quirarte was anything other than an employee who was paid a wage or salary, or that she was in a

17  position to either accept or reject any "Federal financial assistance" reportedly received by Central

18  Coast Nephrology. *See Grzan*, 104 F.3d at 120 ("Absent specific allegations to the contrary, we

19  can only assume that as an employee who merely was paid a wage or salary, Greer was never in

20  such a position and thus was never a recipient of federal funds.").

21  Even liberally construing the SAC, none of Mr. Delacruz's allegations plausibly establish

22  that Ms. Quirarte may be sued under the Rehabilitation Act. Accordingly, Ms. Quirarte's motion

23  to dismiss the Rehabilitation Act claim is granted.

24  **B.  Leave to Amend**

25  Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "should be

---

[3] While an individual meeting certain requirements *could* be eligible to receive a Paycheck Protection Program loan, 15 U.S.C. § 636(a)(36), Mr. Delacruz does not allege that Ms. Quirarte herself obtained any such loan, but only that her employer did.

freely given when justice so requires," and "the court must remain guided by the underlying purpose of Rule 15 . . . to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotations and citations omitted). "The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court," which may deny leave to amend if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the party seeking amendment has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Mr. Delacruz has already amended his complaint twice. The allegations of the SAC are not materially different from those in his prior pleadings. The Court finds no basis to conclude that there are additional facts that could be alleged in a further amendment to cure the deficiency in his Rehabilitation Act claim. Accordingly, the Court finds that further amendment would be futile and dismisses the Rehabilitation Act claim without leave to amend.

### C. State Law Claims

Where a federal court has original jurisdiction over a claim pursuant to federal law, it also has supplemental jurisdiction over related state law claims. 28 U.S.C. § 1367(a). A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). As Mr. Delacruz's sole federal claim is dismissed without leave to amend, the Court declines to exercise supplemental jurisdiction over any of the state law claims asserted in the SAC. Those claims are dismissed without prejudice to Mr. Delacruz asserting them in an appropriate state court.

## IV. CONCLUSION

Based on the foregoing, Ms. Quirarte's motion to dismiss the SAC is granted as follows:

1. Mr. Delacruz's Rehabilitation Act claim is dismissed, without leave to amend.

2. Mr. Delacruz's state law claim against Ms. Quirarte is dismissed, without prejudice to assert the claim in an appropriate state court.

///

///

3.  The Clerk shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: July 25, 2024

*Virginia K. DeMarchi*
Virginia K. DeMarchi
United States Magistrate Judge